#FW 034196

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 26 2020

CLERK, U.S. DISTRICT COURT

By_____
Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CYNTHIA GRADY, | § § § § | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3729, et seq. |
| Plaintiffs, | § § | SEALED |
| v. | § § § | No. 4-20CV0177-P |
| CHILD CARE ASSOCIATES, INC., | § § | |
| Defendant. | § § | JURY TRIAL DEMANDED |

## RELATOR'S ORIGINAL COMPLAINT

Relator Cynthia Grady, on behalf of the United States of America, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733, files this Complaint against Defendant Child Care Associates, Inc. This Complaint is premised on Defendant's scheme to defraud the United States Government of Head Start grants by enrolling ineligible children and misreporting enrollment rates to obtain federal grant funds. In support thereof, Relator alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 31 U.S.C. § 3729, *et seq.*, and 31 U.S.C. § 3730(b).

2.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

3.      This case is based on the knowledge of Relator Cynthia Grady, an "original source" as those terms are defined in 31 U.S.C. § 3730.

4.      This Complaint has been filed under seal and shall remain under seal for at least sixty (60) days and until the Court so orders.

1

5. A copy of this Complaint has been served on the United States Attorney General and the United States Attorney for the Northern District of Texas.

6. All conditions precedent required by 31 U.S.C. § 3730 have occurred.

## PARTIES

7. Plaintiff, the United States of America, brings this action on behalf of the Administration for Children and Families (the "ACF"), a division of the United States Department of Health and Humans Services ("HHS"), which provides grants to local public and private non-profit or for-profit agencies that wish to operate a Head Start program.

8. Relator Cynthia Grady ("Relator") is a resident of the State of Texas.

9. Defendant Child Care Associates, Inc. is a Texas corporation with its principal place of business located at 3000 E. Belknap St., Fort Worth, TX 76111.

## THE LAW

10. Generally, the False Claims Act, 31 U.S.C. §§ 3729-3733, (the "FCA") prohibits any person from (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval to the Government; (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspiring with others to commit a violation of the FCA; and (4) knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government.

11. The FCA allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court on behalf of the United States Government. *See* 31 U.S.C. § 3730(b)(1). The objective of Congress in passing the FCA "was broadly to protect the funds and property of the Government from fraudulent claims,

2

regardless of the particular form or function of the government instrumentality upon which such claims were made." *Rainwater v. United States*, 356 U.S. 590, 592 (1958).

## THE HEAD START PROGRAM

12.    The Head Start program is authorized by the Improving Head Start for School Readiness Act of 2007 (the "Head Start Act," or the "Act") and is intended to "encourage the development of special programs by which residents of urban and rural low-income areas may . . . improve the quality of their economic and social participation in community life in such a way as to contribute to the elimination of poverty and the establishment of permanent economic and social benefits." 42 U.S.C. § 9801. Head Start and Early Head Start programs are based in centers and schools, child care and family child care homes, or even in at-home settings in which staff conduct weekly visits to children in their own home.

13.    In order to facilitate the funding of Head Start programs, Head Start grants are awarded to public or private non-profit organizations. Early Head Start programs are funded in the same manner, "except applicants need not be from the community they will be serving."[1] Head Start and Early Head Start programs can find available Office of Head Start ("OHS") funding opportunities on the ACF Funding Opportunity Announcements ("FOA") website, by searching the Catalog of Federal Domestic Assistance ("CFDA"), or through OHS' FOA locator online.[2]

14.    Grant applications are reviewed by a panel of at least three (3) independent subject matter experts, who separately score the application according to evaluation criteria found in each FOA. Each panel includes a chairperson who "facilitates the review process and compiles comments for the Applicant Panel Summary Report," but does not score the

---

[1] OFFICE OF HEAD START, AN OFFICE OF THE ADMINISTRATION FOR CHILDREN & FAMILIES, Funding Opportunities, https://www.acf.hhs.gov/ohs/funding (last visited Dec. 10, 2019).
[2] *Id.*

3

applications.[3] Some common scoring categories include: objectives and needs for assistances; approach; program performance evaluation; organizational capacity; and budget/budget justification.[4] The chairperson sends the Applicant Panel Summary Report to the federal staff member(s) overseeing the panel after reviewers have reached a consensus. "Once approved by the federal staff member, the final score for each application is sent to the program office for consideration in making their funding decisions."[5]

15.    Once a Head Start agency receives federal grant funds, it must meet the criteria described at 42 U.S.C. § 9836a(a)(1)(A)-(E) which include, but are not limited to, service, education, administrative and financial, and facility standards. The Secretary of HHS (the "Secretary") is responsible for reviewing grantees and their programs "to determine whether Head Start agencies meet standards described in subsection (a)(1) . . . ." 42 U.S.C. § 9836a(c). To obtain and maintain federal funds, grantees must comply with Program Performance Standards codified at 45 C.F.R. Chapter XIII Parts 1301, 1302, and 1303. A grantee's failure to comply with the standards enumerated in Chapter XIII could result in noncompliance status, suspension, deficiencies, termination or a reduction of funding. *See* 45 C.F.R. Part 1304 Subpart A.

16.    To ensure each Head Start agency complies with the criteria described at 42 U.S.C. §§ 9836a(a)(1)(A)-(E), agencies must accurately report the following information regarding operations for use by the governing body and policy counsel:

    (A)    monthly financial statements, including credit card expenditures;
    (B)    monthly program information summaries;
    (C)    program enrollment reports, including attendance reports for children whose care is partially subsidized by another public agency;

---

[3] HEAD START EARLY CHILDHOOD LEARNING & KNOWLEDGE CENTER, Understand the Review Process, https://eclkc.ohs.acf.hhs.gov/grant-application/article/understand-review-process (last visited Dec. 10, 2019).
[4] *Id.*
[5] *Id.*

(D)     monthly reports of meals and snacks provided through programs of the Department of Agriculture;

(E)     the financial audit;

(F)     the annual self-assessment, including any findings related to such assessment;

(G)     the communitywide strategic planning and needs assessment of the Head Start agency, including any applicable updates;

(H)     communication and guidance from the Secretary; and

(I)     the program information reports.

42 U.S.C. § 9837(d)(2).

17.     A grantee's financial assistance may be terminated, or their application for refunding may be denied, for failure to timely correct one or more deficiencies, failure to comply with eligibility requirements, failure to comply with the requirements in the Head Start Act, or failure to abide by any other terms and conditions of its award of financial assistance, among other reasons. *See* 45 C.F.R. §§ 1304.5(a)(2)(i)-(viii).

18.     Uncorrected deficiencies that may lead to termination of a grantee's financial assistance or denial of its application for refunding include, but are not limited to, a threat to the health, safety[6], or civil rights of children or staff, or the misuse of funds received under the Head Start Act. *See* 42 U.S.C. § 9832(2)(a)(i)-(vi). Importantly, a Head Start agency with one or more deficiencies on a single review is not guaranteed federal funding, and instead is *required* to compete for its next five (5) years of funding pursuant to 45 C.F.R. § 1304.11.

19.     Grantees that experience underenrollment could also face a reduction of grants and redistribution of funds pursuant to 42 U.S.C. § 9836A(h). Under 42 U.S.C. § 9836A(h)(2), "[e]ach entity carrying out a Head Start program shall report on a monthly basis to the Secretary and the relevant Head Start Agency – (A) the actual enrollment in such program; and (B) if such actual enrollment is less than the funded enrollment, any apparent reason for such enrollment shortfall." If a Head Start program is operating with an actual enrollment that is less than its

---

[6] Head Start agencies are required to meet safety requirements codified at 45 C.F.R. § 1302.47.

5

funded enrollment, the Secretary shall collaborate with the agency to develop "a plan and timetable for reducing or eliminating underenrollment . . . ." 42 U.S.C. § 9836A(h)(3)(B).

20. If a Head Start agency continues to operate a program with an actual enrollment that is less than 97% of its funded enrollment after collaborating with the Secretary to develop a plan for reducing underenrollment, the Secretary may designate the agency as chronically underenrolled and "recapture, withhold, or reduce the base grant for the program by a percentage equal to the percentage difference between funded enrollment and actual enrollment for the program for the most recent year for which the agency is determined to be underenrolled." 42 U.S.C. §§ 9836A(h)(5)(A)(i)-(ii). All funds obtained by the Secretary through recapture, withholdings, or reduction to a base grant are then redistributed to other programs by the end of the following fiscal year. *See* 42 U.S.C. § 9836A(h)(6).

21. A Head Start program that receives funding through federal grants may have its financial assistance terminated in whole or in part, or have its refunding denied for any one or for all of the following reasons:

| | |
|---|---|
| (i) | The grantee is no longer financially viable; |
| (ii) | The grantee has lost the requisite legal status or permits; |
| (iii) | The grantee has failed to timely correct one or more deficiencies as defined in the Act; |
| (iv) | The grantee has failed to comply with eligibility requirements; |
| (v) | The grantee has failed to comply with the Head Start grants administration or fiscal requirements set forth in 45 C.F.R. part 1303; |
| (vi) | The grantee has failed to comply with requirements in the Act; |
| (vii) | The grantee is debarred from receiving federal grants or contracts; or |
| (viii) | The grantee has failed to abide by any other terms and conditions of its award of financial assistance or any other applicable laws, regulations, or other applicable federal or state requirements or policies. |

45 C.F.R. §§ 1304.5(a)(2)(i)-(viii).

22. Prior to enrolling a child into a Head Start or Early Head Start program, agency staff must:

(i)     Conduct and in-person interview with each family, unless paragraph (a)(2) of this section applies;

(ii)     Verify information as required in paragraphs (h) and (i) of this section; and,

(iii)     Create an eligibility determination record for enrolled participants according to paragraph (k) of this section.

45 C.F.R. § 1302.12(a).

23.     Children must satisfy income eligibility requirements in order to be enrolled in an Early Head Start or Head Start program. A child is eligible to participate in a Head Start or Early Head Start program if:

(i)     The family's income is equal to or below the poverty line; or,

(ii)     The family is eligible for, or in the absence of child care, would be potentially eligible for public assistance; including TANF child-only payments; or,

(iii)     The child is homeless, as defined in part 1305; or,

(iv)     The child is in foster care.

45 C.F.R. §§ 1302.12(c)(1)(i)-(iv).

24.     Head Start and Early Head Start program eligibility determination records must include:

(i)     Copies of any documents or statements, including declarations, that are deemed necessary to verify eligibility under paragraph (h) and (i) of this section;

(ii)     A statement that program staff has made reasonable efforts to verify information by:

      (A)     Conducting either an in-person, or telephone interview with the family as described under paragraph (a)(1)(i) or (a)(2) of this section; and,

      (B)     Describing efforts made to verify eligibility, as required under paragraph (h) through (i) of this section; and, collecting documents required for third party verification that includes the family's written consent to contact each third party, the third parties' names, titles, and affiliations, and information from third parties regarding the family's eligibility.

(iii)     A statement that identifies whether:

      (A)     The family's income is below income guidelines for its size, and lists the family's size;

      (B)     The family is eligible for or, in the absence of child care, potentially eligible for public assistance;

      (C)     The child is a homeless child or the child is in foster care;

      (D)     The family was determined to be eligible under the criterion in paragraph (c)(2) of this section; or,

7

(E)   The family was determined to be eligible under the criterion in paragraph (d)(1) of this section.

45 C.F.R. § 1302.12(k). Importantly, Head Start and Early Head Start programs must keep eligibility records for as long as a child is enrolled and for one year after they have either stopped receiving services or are no longer enrolled. *Id.*

## FACTUAL BACKGROUND

25.   CCA operates both Head Start and Early Head Start programs that reach more than 17,000 children through over twenty three (23) campuses across Tarrant County. CCA is a $90 million organization and claims to be the largest child development organization in North Texas. In 2018, CCA received approximately $25 million in federal grant funds for services to children and families. CCA also received subsidies from the State of Texas through Child Care Management Services (CCMS) along with funds from the United Way and other private donors.

26.   CCA's programs are designed to prepare low-income children for success in kindergarten and its Early Head Start programs are designed to benefit expectant families, infants, toddlers, and its Head Start programs for three (3) and four (4) year olds and include *full-day* early childhood education, child assessments and developmental screenings, meals, home visits, access to primary health and dental health provider, referrals to an onsite delivery of disability and behavioral health services, activities that engage and support families, and external assessments of classroom quality. CCA also partners with Tarrant County school districts and charter schools to deliver Head Start Pre-K Plus, which offers a mix of Head Start and Pre-K in the following school districts: Arlington, Crowley, Everman, Fort Worth, Lake Worth, and Uplift Meridian Preparatory.

27.   Relator worked as a Program Performance Coordinator in CCA's Fort Worth office from October 2016 until July 2019. Relator's duties included, but were not limited to,

8

maintaining general oversight of CCA's data management system to ensure its database was current; developing and presenting data reports to capture performance, achievement gaps and opportunities; establishing a continuous performance and quality improvement effort with monitoring and a reporting system; working across the CCA organization to ensure a sound system of monitoring and quality assurance on key metrics; and supporting other members of the Senior Management Team with needed data, analysis, and reports. *See* Rel. Discl. No. 1.

## A.    Enrolling Ineligible Children

28.    Throughout July and/or August 2019, CCA improperly enrolled children in its Crowley Independent School District ("ISD") Head Start site that were above the poverty line. CCA's partnership with Crowley ISD began suddenly after CCA lost Head Start contracts with Keller and White Settlement ISDs just before the beginning of the 2019/2020 school year. Therefore, CCA's Crowley site had a condensed timeframe in which to enroll children into its Head Start program before the 2019/2020 school year began. As a result of the shortened enrollment period, CCA did not provide the school district with the Head Start enrollment requirements or guidelines.

29.    When CCA entered into its partnership with Crowley ISD, Relator was immediately concerned that families with children in the Crowley school district would not qualify for CCA's program because the average income in the area is well over the poverty line. Importantly, Relator had been a Crowley resident since June 2018 and had general knowledge of the average earnings of the families in her community. Relator also accessed Buxton, a consumer analytics software tool used by CCA, to survey average income amounts for Crowley. This tool indicated that Crowley's average income was well above the federal poverty line, suggesting CCA would experience difficulty finding eligible students.

9

30.    Traditionally, CCA recruited children for Head Start programs by setting up booths at neighborhood stores and events. CCA also received names of children from the school district in which it was establishing a Head Start program who may be suitable for the program (i.e., low income children, children with disabilities, and other vulnerable children, including homeless and foster children). However, CCA engaged in no recruiting activities prior to enrolling students at the Crowley ISD site. In fact, CCA had only basic information about the children that were enrolled in the Crowley ISD site, such as their names, dates of birth, and addresses.

31.    CCA also enrolled children at the Crowley ISD site without obtaining necessary income and health documentation, and without conducting an interview with each enrolled child's family pursuant to 45 C.F.R. § 1302.12(a) prior to enrollment. Although the children enrolled CCA attended Crowley ISD Head Start classrooms beginning in July and August 2019, CCA had not obtained documentation to show the families' income qualified their children for acceptance into the program.[7]

32.    Relator searched CCA's ChildPlus system and physical files to obtain enrollees' financial documentation between July and August 2019, when children began attending CCA's Head Start classrooms in Crowley ISD. However, Relator discovered CCA had not obtained *any* financial records for the children enrolled at the Crowley ISD site.

33.    Relator was unable to access any financial records for families with children enrolled at CCA's Crowley ISD site because CCA and/or Crowley ISD did not request financial eligibility information from families until *after* their children were already enrolled in and

_____

[7] Head Start applicants demonstrate income qualification by providing pay stubs, an IRS 1040, any award letters or entitlement to Supplemental Security Income, TANF records, proof of any grants or scholarships, court documents for child and/or spousal support, foster care payments, a signed letter from an employer, letters from family members outlining any gifts, and any other documentation required to demonstrate eligibility.

attending the program in violation of 45 C.F.R. § 1302.12. Instead, CCA enrolled children in Head Start at the Crowley ISD site without obtaining eligibility records and documentation and worked backward to compile eligibility records after children were already enrolled in the program and attending classes. Although it took approximately three (3) months for CCA to even begin obtaining eligibility records and documentation from families, children remained enrolled in class for the duration of this time period.

34. From September to October 2019, CCA received *some* eligibility documentation from families whose children had been enrolled and attending the Crowley ISD program for months. However, through an internal audit, Relator determined approximately thirty-six percent (36%) of the children enrolled in the Crowley ISD program had a family income in excess of the poverty line and therefore did not qualify for Head Start. Such children were improperly recruited and enrolled at CCA's Crowley ISD Head Start site in violation of 45 C.F.R. § 1302.14.

35. Relator notified CCA's Head Start Director, Irma Pena ("Pena") that children enrolled at the Crowley ISD site were over-income. In response, Pena justified CCA's recruitment and enrollment of over-income children based on the Head Start Program Performance Standards, which *technically* allow for an additional thirty-five percent (35%) enrollment of over-income children. *See* 45 C.F.R. § 1302.12(d).

36. However, Pena was incorrect about CCA's ability to enroll over-income children at the Crowley ISD site. While Head Start Performance Standards permit enrollment of over-income children to Head Start programs, there are several requirements that a Head Start program must satisfy prior to enrolling over-income children. *See* 45 C.F.R. § 1302.12(d). In order for a Head Start program to enroll over-income children, it must first meet the needs of

eligible children and children with disabilities prior to serving children that do not meet income and other eligibility requirements set forth at 45 C.F.R. § 1302.12(c). Additionally, if a Head Start program enrolls over-income children it must be able to report "[o]utreach and enrollment policies and procedures that ensure it is meeting the needs of eligible children . . . before serving over-income children . . . ." 45 C.F.R. § 1302.12(d)(2)(ii). Although CCA had not exceeded the thirty-five percent (35%) threshold for enrolling over-income children, CCA failed to comply with the requirements set forth in § 1302.12(d) prior to enrolling over-income children.

37. CCA's Crowley ISD site also failed to recruit children most in need of services pursuant to 45 C.F.R. §§ 1302.13-1302.14.[8] CCA failed to

> establish selection criteria . . . based on community needs . . . including family income, whether the child is homeless, whether the child is in foster care, the child's age, whether the child is eligible for special education and related services, or early intervention services . . . [among] other relevant family or child risk factors.

45 C.F.R. § 1302.14. Instead, CCA enrolled children at the Crowley Head Start site without any set parameters.

38. Relator reviewed family eligibility documentation and records stored in CCA's ChildPlus system and determined that thirty-six percent (36%) of children enrolled at CCA's Crowley ISD site did not qualify for Head Start. Furthermore, of the documentation that CCA did eventually collect, some enrollment applications were not signed by a parent or guardian to certify the documented information was correct. CCA subsequently failed to un-enroll students from the Crowley ISD program that exceeded the poverty line or that had incomplete and/or unsigned documentation.

---

[8] CCA's Crowley Head Start program was not the only site that failed to enroll children with the greatest need. In fact, Pena created her own ranking system for enrolling students, which did not comply with the selection criteria set forth at 45 C.F.R. §§ 1302.13-1302.14 and did not ensure that CCA served families and/or children with the greatest need.

39.    Once CCA finally received some of the eligibility records for children at the Crowley ISD site, Pena instructed CCA staff to forward-date enrollment. Rather than report enrollment dates as the date children first attended at Head Start classroom at the Crowley ISD site between July and August 2019, Pena directed CCA staff to change enrollment dates to September and/or October 2019 to correspond with CCA's receipt of eligibility records.

40.    Pena also directed CCA family service specialists to falsify call logs so that it appeared as though CCA attempted to collect eligibility documentation for the Crowley ISD site. Pena instructed CCA family service specialists to make backdated call log entries into students' Child Plus records so that it appeared an attempt was made to contact families for eligibility records prior to enrollment. However, CCA made very few, if any, attempts to collect eligibility documentation prior to enrolling children into the Crowley ISD Head Start program at the beginning of the 2019/2020 school year. CCA's family service specialists carried out Pena's directives because she repeatedly threatened their jobs if they did not falsify ChildPlus records.

41.    If OHS had conducted an audit prior to Pena's manipulation of the children's enrollment dates, CCA would not have been in compliance with eligibility documentation requirements prescribed by 45 C.F.R. § 1302.12. Such noncompliance would have a damaging impact on CCA's future funding opportunities and could have forced CCA into open competition for federal grant funds under 45 C.F.R. § 1304.11. Accordingly, Pena directed CCA staff to forward-date enrollment and falsify call logs to ensure that CCA would not be found noncompliant in the event of an OHS audit.

42.    Additionally, several children that were enrolled at CCA's Crowley ISD site never attended the program. Pena instructed CCA staff to delete such children from the ChildPlus system although CCA received federal funds based on their enrollment. CCA's

13

ChildPlus system stores all program enrollment information. Although data entries in the ChildPlus system can be changed, the system maintains a log of all data edits. Accordingly, all changes that were made to CCA's Crowley ISD records per Pena's instruction can be accessed through CCA's ChildPlus system. Further, although the enrollment dates were changed at Pena's direction, teacher's salaries in the Crowley program had been paid since July and/or August 2019, thereby demonstrating that CCA's Crowley program was operational and children were attending classes before CCA received all records required to substantiate eligibility.

**B.    <u>Intentional Misreporting</u>**

### i.    **Enrollment figures**

43.    CCA routinely overstates program enrollment figures when reporting to the Secretary pursuant to § 641A of the Head Start Act. Head Start and Early Head Start programs must provide a monthly report to the Secretary that includes both the program's actual enrollment and "if such actual enrollment is less than the funded enrollment, any apparent reason for such enrollment shortfall." 42 U.S.C. §§ 9836A(h)(2)(A)-(B).

44.    Upon information and belief, CCA overstated program enrollment figures to avoid having to collaborate with the Secretary to establish a "plan and timetable for reducing or eliminating underenrollment." 42 U.S.C. § 9836A(h)(3)(B). By overstating enrollment figures, CCA ensured that OHS remained unaware of its underenrollment and avoided Secretarial review and adjustment for chronic underenrollment. If CCA accurately reported its enrollment figures that were below funded enrollment requirement, the Secretary could "recapture, withhold, or reduce the base grant for the program by a percentage equal to the percentage difference between funded enrollment and actual enrollment for the program for the most recent year for which the agency is determined to be underenrolled . . . ." 42 U.S.C. § 9836A(h)(5)(A)(ii). Furthermore, if

14

CCA accurately reported program enrollment and the Secretary determined, based on CCA's monthly reports, that CCA's programs were underenrolled, the Secretary could recapture CCA's grants funds and redistribute such funds to other programs pursuant to 42 U.S.C. § 9836A(6).

45.    Relator first discovered CCA's inaccurate enrollment reporting when OHS was on-site at CCA's main office to perform an audit from May 14 through May 18, 2018. During the first day of the audit, OHS found that CCA did not have child health status documentation required under 45 C.F.R. § 1302.42.

46.    No later than thirty (30) days after a child first attends a CCA Head Start program, CCA "must consult with parents to determine whether each child has ongoing sources of continuous, accessible health care . . . and health insurance coverage." 45 C.F.R. § 1302.42(a)(1). Within ninety (90) calendar days of a child's first attendance, CCA must "[o]btain determinations from health care and oral health care professionals as to whether or not the child is up-to-date on a schedule of age appropriate preventative and primary medical and oral health care . . . ." 45 C.F.R. § 1302.42(b)(1)(i). Additionally, within forty-five (45) days of attendance, CCA must "either obtain or perform evidence-based vision and hearing screenings." 45 C.F.R. § 1302.42(b)(2).

47.    After the first day of the May 2018 OHS audit, Pena pulled all children's files that did not contain documentation of the student's health status and health needs. Of the 1,958 children enrolled in CCA's Head Start program, approximately four hundred and forty-three (443) did not have physical or dental exam records. *See* Rel. Discl. No. 2. Additionally, thirty (30) out of the one hundred and eighty-seven (187) student files reviewed by OHS in the audit did not contain documentation of CCA's follow-up efforts to help parents acquire such records.

48.    In an effort to cover-up the absence of assessment and medical documentation in the children's files, Pena instructed CCA staff to print out letters that falsely represented CCA had contacted families to obtain the documentation that was necessary to support enrollment. Relator overheard Melinda Rhodes ("Rhodes"), CCA's Health Coordinator, complain about Pena's instruction to falsify letters requesting medical documentation and advised her that CCA could not add letters to student files that were never sent to the families. Rhodes indicated that Pena had instructed her to add the letters to the files. Relator immediately instructed CCA staff that they could not add letters to student files that were never sent to families. The following CCA employees then worked overtime in advance of the next day of the audit to ensure the fraudulent letters were removed from all student files: Sarah Bailey ("Bailey"), Comprehensive Child Services Coordinator; Mary Conner, Regional Manager; Tressa Byrd, Regional Manager; Linda Todd, Training Coordinator; Yolanda Williams, Education Coordinator; and Maribel Arambula ("Arambula"), Family Services Coordinator.

49.    Upon information and belief, CCA had tried to avoid receiving a non-compliance from OHS despite failing to make a continuing effort to obtain necessary health records from students' families. CCA misrepresented that it routinely requested necessary health records for students to avoid investigation and the risk of having its federal grant funds reduced or redistributed due to underenrollment.

50.    During the May 2018 audit, OHS did discover that CCA failed to request, obtain and/or maintain appropriate health records and found CCA noncompliant. However, CCA did not change its practice of failing to make a continuing effort to obtain health records and avoided receiving a non-compliance for the next school year (2018/2019) despite failing to make a continuing effort to obtain necessary health records.

51.    CCA also inflated its enrollment rates in June and/or July 2018. After Relator returned from an approved vacation, Sharon Jones ("Jones"), CCA's interim Family Services Coordinator, told Relator that she had informed an OHS reviewer that CCA enrolled one-hundred percent (100%) of children that were accepted into its Head Start programs.

52.    Upon learning of the OHS reviewer's visit and Jones' report of one-hundred percent (100%) enrollment, Relator asked Jones if CCA actually verified that every child was present in class and had been signed-in on the attendance sheet. Head Start program attendance standards require that a child's slot should be considered vacant if the child ceases to attend the program. *See* 45 C.F.R. § 1302.16(a)(3). Therefore, CCA cannot count "vacant" seats as enrolled for the purpose of its monthly reports to the Secretary.

53.    Jones stated that most children *had not* attended class and therefore were not signed-in on the attendance sheet. Jones also stated that Pena verbally instructed Jones, Ximena Adame-Ochoa, CCA's Data Entry Specialist, Annabelle Valdez and Lacy Gutierrez, CCA Family Services Specialists, to count all children as enrolled, regardless of their failure to attend class. When Relator confronted Pena about CCA reporting children as enrolled who had *never* attended a class, Pena admitted that she knew the children could not be considered enrolled. However, Pena took no further action to remedy CCA's misreporting of 100% enrollment for its Head Start programs.

54.    CCA's attendance logs evidence its inaccurate reporting of children as enrolled when they never attended a single class and are stored on the ChildPlus system. Such attendance logs demonstrate that numerous enrolled children never attended a class and therefore cannot be counted as enrolled for purposes of reporting to the Secretary. Importantly, any changes that were made to records in the ChildPlus system can be traced through the user's IP address.

17

55.    CCA routinely counted children as enrolled when they were accepted into the program, despite their failure to ever attend a Head Start class. *See* Rel. Discl. No. 3. Accordingly, CCA was able to inflate enrollment figures in its monthly reports to the Secretary to avoid investigation and the risk of having its federal grant funds reduced or redistributed due to underenrollment.

56.    Several months later, CCA obtained a grant for an Early Head Start home based program. In order for CCA to be entitled to this grant, OHS required proof of CCA's enrollment figures. Pena, as CCA's director, is the only CCA employee with access to CCA's Exchange System, which is how enrollment data is reported to OHS. Relator provided accurate enrollment data that did not count children that failed to attend class as enrolled to Pena so that CCA's enrollment figures could be correctly reported to OHS. Upon receipt of CCA's accurate enrollment figures provided by Relator, Pena admonished Relator for failing to document CCA's enrollment at 100%.

57.    Relator informed Pena that she could not document 100% enrollment for CCA's programs, as numerous children had to be un-enrolled for failure to attend class. Relator further asked Pena whether federal funds that CCA received based on overstated enrollment figures would be refunded. Pena stated that she would "figure it out," however, she never discussed the issue with Relator again.

### ii.    Falsified Program Information Reports

58.    CCA routinely passed federal audits by omitting information from Program Information Reports ("PIRs") that are provided to OHS. PIRs are submitted annually through the Head Start Enterprise System ("HSES") and present aggregated data about a wide range of items requested by OHS including, but not limited to: staff qualifications, curriculum information,

screening and assessment instruments, detailed enrollment data, and parent employment information. As CCA's Program Performance Coordinator, Relator was responsible for maintenance of all program data, including enrollment and other information reported in the PIR. Accordingly, Relator sat with Pena in her office and assisted while Pena completed PIRs. Arambula and Latresa Williams, CCA's Data Entry Specialist, were also present when Pena prepared CCA's PIRs.

59.    To complete CCA's PIRs, Pena loaded the PIR form into ChildPlus and the form was populated with data pulled directly from ChildPlus. Pena often criticized the information that automatically populated into the PIR from ChildPlus. However, Relator was sure of the accuracy of the data in ChildPlus, as it was her responsibility to ensure correct reporting of all CCA data. Pena often changed the information that was populated into the PIR from ChildPlus to information that was more favorable to CCA. *See* Rel. Discl. No. 4. Relator observed Pena edit the PIR information when Pena completed reports for the 2016/2017 and 2017/2018 school years.

60.    Although Pena routinely changed data in CCA's PIRs, there was no objective basis for her edits. For example, if the PIR indicated CCA served one-hundred (100) children with chronic medical conditions, but the PIR only showed that CCA provided services to sixty (60) of those children, Pena would change the PIR to reflect that CCA provided services to at least one-hundred (100) children with chronic medical conditions. Pena justified changing the PIR because she believed the data input into the PIR from ChildPlus "did not sound right," or "should probably be higher." However, Pena made no effort to verify whether the pre-populated data from ChildPlus was erroneous. Instead, Pena changed the CCA's numbers to reflect what she believed the PIR data should have been.

## C.    Failure to Enroll Children in Full-Day Programs

61.    From 2016 through 2019, CCA claimed federal funds for providing child care services for full day Head Start programs. However, CCA only provided half day services for several years in the following school districts: Fort Worth, Keller, Arlington, Everman, Grapevine/Colleyville, White Settlement, and Crowley. In order to obtain federal funds for the programs in the aforementioned school districts, CCA submitted false reports to OHS that stated it operated full day classrooms. Accordingly, CCA received full funding, rather than merely funds for partial day programs. CCA's half day scheme occurred in approximately forty-seven (47) of their one hundred and forty eight (148) classrooms and impacted approximately nine hundred and forty (940) children.

62.    From 2015 to 2018, CCA received funding for 2,014 Head Start seats and reported that recipients were primarily center based, and attended programs five (5) days per week, for more than six (6) hours per day. *See* Rel. Discl. Nos. 2, 5-9. However, CCA's Head Start classrooms in the aforementioned school districts were not full day classrooms and children did not attend for more than six (6) hours per day. Instead, CCA operated half day programs, which allowed for twenty (20) students to attend a morning program and twenty (20) different students to attend an afternoon program. Students in the morning program were transferred to a traditional pre-k classroom after the morning session. Similarly students in the afternoon program would attend a traditional pre-k classroom until conclusion of the morning session, and were transferred to a Head Start classroom in the afternoon. By operating in this manner, CCA was able to manipulate Head Start programs in these school districts so the program appeared to have forty (40) full-time students enrolled. In reality, however, these programs were actually two (2) separate half-day programs, with only twenty (20) students enrolled each half day program.

20

63.     During a meeting in March or April of 2016, Relator asked Pena whether CCA's practice of half-day Head Start programs was improper. Arambula and a ChildPlus representative, Kenna Pruit, also questioned Pena about the legality of CCA's half-day programs. Bailey was also present during this meeting. Pena stated that everything would be fine because CCA had never been in trouble for operating half-day programs in the past.

64.     Pena ensued OHS did not discover CCA was operating half-day programs by directing and creating schedules for OHS reviewers so that they only visited classrooms when the Head Start program was operating. Pena routinely instructed Yolanda Williams, an employee in CCA's education department, to create review schedules that ensured reviews only occurred during a time that a classroom was operating as Head Start classroom.

65.     Relator questioned Pena about CCA's half-day Head Start programs again in 2017; however, CCA continued to covertly operate half-day programs while it obtained full day program funding. In 2018, CCA changed its half-day program model and now requires teachers to swap classrooms instead of transferring students between Head Start and traditional classrooms.

66.     In addition to fraudulently obtaining funding from OHS for full-day programs while CCA operates half-day programs in these schools districts, CCA also failed to comply with Head Start Performance Standards' staff qualification requirements. When children are not in a Head Start classroom in these school districts, they are in a traditional pre-k classroom with school district staff that have not been screened by CCA to ensure compliance with 45 C.F.R. § 1302.91 staff qualifications and competency requirements.

67.     The Head Start Act requires that

at least 50 percent of Head Start teachers nationwide in center-based programs have—

21

> (i)    a baccalaureate or advanced degree in early childhood education; or
>
> (ii)   a baccalaureate or advanced degree and coursework equivalent to a major relating to early childhood education, with experience teaching preschool-age children.

42 U.S.C. §§ 9843a(a)(2)(i)-(ii); *see also* 45 C.F.R. § 1302(2)(ii). Furthermore, when a classroom in a center-based program does not have a teacher who meets the qualifications, the Head Start Act requires such classroom is assigned one teacher who has

> (i)    an associate degree in early childhood education;
>
> (ii)   an associate degree in a related field and coursework equivalent to a major relating to early childhood education, with experience teaching preschool-age children; or
>
> (iii)  a baccalaureate degree that has been admitted into the Teach for America program, passed a rigorous early childhood content exam, such as the Praxis II, participated in a Teach For America summer training institute that includes teaching preschool children, and is receiving ongoing professional development and support from Teach For America's professional staff.

42 U.S.C. §§ 9843(a)(3)(i)-(iii). Furthermore, traditional pre-k classroom instructors are not required to satisfy the Head Start Act's teacher in-service requirement set forth at 42 U.S.C. § 9843(a)(5).[9] Accordingly, CCA failed to verify that traditional classroom instructors met the Head Start Act's staff qualification requirements and did not have staff files of traditional pre-k classroom teachers available for review by OHS.

## D.    Unreported Accidents and Incidents to OHS

68.    CCA has been cited by OHS for failure to ensure all staff, consultant, contractors, and volunteers abided by the program's standards of conduct to not maltreat or endanger the health and safety of children. *See* Rel. Discl. Nos. 10, 11. However, CCA failed to report certain accidents and injuries to OHS and Pena routinely instructed staff not to report child accidents and injuries to OHS and the State of Texas. Relator, along with Connie Thompson and Lakeisha

---

[9] "Each Head Start teacher shall attend not less than 15 clock hours of professional development per year. Such professional development shall be high-quality, sustained, intensive, and classroom-focused in order to have a positive and lasting impact on the classroom instruction and the teacher's performance in the classroom, and regularly evaluated by the program for effectiveness." 42 U.S.C. § 9843(a)(5).

Davis, CCA Quality Assurance employees, witnessed CCA staff being instructed by Pena not to report incidents.

69.    On or about October 2, 2018, a child was injured at a CCA Head Start site and required stiches. *See* Rel. Discl. No. 12. CCA failed to report the incident to Texas Health and Human Services and OHS. Upon information and belief, CCA has completed an OHS incident report for only three (3) out of approximately fifteen (15) child safety incidents that have occurred since the beginning of the 2016/2017 school year. *Id.*

70.    Additionally, in June and September 2019, multiple children were improperly disciplined by being spanked by CCA staff. CCA staff also withheld food from children as a form of punishment. Appropriate disciplinary procedures for child-care centers provide, in pertinent part, discipline must be:

(4)    A **positive** method of discipline and guidance that encourages self-esteem, self-control, and self-direction, including the following:

(A)    Using praise and encouragement of good behavior instead of focusing only upon unacceptable behavior;

(B)    Reminding a child of behavior expectations daily by using clear, **positive** statements;

(C)    Redirecting behavior using **positive** statements; and

(D)    Using brief supervised separation or time out from the group, when appropriate for the child's age and development, which is limited to no more than one minute per year of the child's age.

26 Tex. Admin. Code § 746.2803 (emphasis added). Furthermore, Head Start performance standards explicitly prohibit staff from using corporal punishment and use or withholding of food as a punishment or reward. *See* 45 C.F.R. § 1302.90(c)(1)(ii)(A), (D).

71.    CCA staff's discipline by corporal punishment and food deprivation was certainly outside of the prescribed positive disciplinary measures prescribed under the Texas Code and directly violated Section 1302.90(c)(1)(ii)(A) and (D). However, CCA failed to report incidents involving excessive discipline by its staff to OHS.

23

### E.    Relator's Termination

72.    During her employment at CCA, Relator provided weekly dashboard reports to CCA's management every Monday.[10] Relator's reports contained accurate data for enrollment, performance, and other metrics that were routinely misreported by Pena. Often, Pena alleged that Relator's data was incorrect. However, management routinely informed Pena that they understood how to interpret Relator's reports and that her data was correct.

73.    Throughout her employment, Relator reported her concerns regarding CCA's failure to meet federal requirements by electronic mail to Kara Waddell ("Waddell"), CCA's CEO, Pena, and Shelby Ballard ("Ballard"), CCA's Human Resources Manager. Relator also expressed her concerns regarding Pena in emails exchanged with Waddell and Ballard.

74.    In May 2019, CCA conducted an internal investigation concerning enrollment issues. Several CCA employees were interviewed about CCA's enrollment reporting practices, including Bailey, who informed Relator that Pena was under investigation. *See* Rel. Discl. No. 13.

75.    Relator compiled the emails she previously sent to management concerning CCA enrollment in an effort to assist in CCA's May 2019 investigation. However, Relator was not permitted to assist in the investigation. Instead, Waddell and Ballard had Relator escorted from CCA's office and Relator was placed on administrative leave.

76.    While on administrative leave, Relator returned to CCA's office to be interviewed on May 30, 2019, and June 5, 2019. Relator, Waddell, Ballard, and Patricia Looper, CCA's Director of Operations and Quality Assurance, were present at the May 30th meeting to discuss Relator's reports that Pena misreported CCA's enrollment numbers. *See* Rel. Discl. No. 14. This

---

[10] Relator's reports were provided to Kara Waddell, Irma Pena, and Patricia Looper.

meeting lasted approximately eighteen (18) minutes. The June 5th meeting took place between Relator and CCA's attorney. This meeting lasted approximately three (3) hours.

77.    CCA terminated Relator in July 2019 for using a company computer to send personal emails – an act that was commonplace among CCA employees and had regularly occurred without reprimand until Relator's termination. Upon information and belief, CCA management, including but not limited to Waddell, Ballard and Pena, told CCA employees that all enrollment reporting issues were caused by Relator and cited such activity as the reason for Relator's termination.

## COUNTS

### I.    False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Presentation of False Claims

78.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

79.    At all times relevant to this action, Defendant was legally obligated to *accurately* report its Head Start program's enrollment, administrative and financial, education, performance, facility, and other metrics set forth at 42 U.S.C. § 9836a(1)(A)-(E) and 42 U.S.C. § 9837(d)(2) in order to receive and/or maintain federal grant funds.

80.    Defendant knowingly, willfully, and falsely certified its compliance with federal law when it provided false information about the performance of its Head Start program to obtain and/or maintain federal grant funds in contravention of the reporting requirements set forth at 42 U.S.C. §§ 9836a(1)(A)-(E) and 42 U.S.C. § 9837(d)(2).

81.    Defendant knowingly and willfully presented these claims for payment and/or caused these claims for payment to be presented to the United States Government.

82. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

83. Defendant knew the United States Government relied on, and continues to rely on, Defendant's false certification that Defendant accurately reported information related to the performance of its Head Start program in order to satisfy all conditions to receive and/or maintain federal grant funds.

84. The United States was unaware of Defendant's knowing failure to comply with the Head Start Act and the terms and conditions of its award(s) of financial assistance, and paid claims that otherwise would not have been paid but for Defendant's unlawful conduct.

85. By virtue of the false or fraudulent claims made by Defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00, as adjusted for inflation, for each violation.

## II. False Claims Act, 31 U.S.C. § 3729 (a)(1)(B)
### Use of False Statements

86. Plaintiff incorporates by reference all paragraphs of this Complain set out above as if fully set forth herein.

87. Defendant made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the United States Government.

88. Said false records or statements were made with actual knowledge of their falsity or with reckless disregard or deliberate ignorance of whether or not they were false.

89. By virtue of the false or fraudulent claims made by Defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of

an amount to be determined at trial, plus a civil penalty of $5,500.00 to $11,000.00, as adjusted for inflation, for each violation.

### III.   False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### Concealment to Avoid Obligation to Pay

90.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

91.     Defendant, by virtue of the acts and omissions described above, knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G). Specifically, Defendant failed to accurately report Head Start and Early Head Start program data and thereby avoided a decrease and/or revocation of Government funding that would have occurred if Defendant had included accurate data in its reports. Defendant also failed to refund improperly obtained federal funds it received based on its inaccurate reporting of program data.

92.     As a result of Defendant's actions set forth above, the United States of America has been, and may continue to be, severely damaged.

93.     The acts and omissions described above caused damages to the United States in substantial amounts to be determined at trial.

### PRAYER FOR RELIEF

94.     WHEREFORE, Relator prays that judgment be entered against Defendant, ordering that:

a.     Defendant cease and desist from violating the Federal False Claims Act;

27

b.  Defendant pay not less than $5,500.00 and not more than $11,000.00, as adjusted for inflation, for each violation of 31 U.S.C. § 3729 *et seq.*, plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

c.  Relator be awarded the maximum Relator's share allowed pursuant to 31 U.S.C. § 3730(d);

d.  Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

e.  Defendant be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the damages, penalties, fines, and costs awarded by the Court; and that

f.  The United States and Relator should be awarded such other relief as the Court deems just and proper.

## JURY TRIAL

95.  Pursuant to Rule 38 of the Fed. R. Civ. P., Relator demands a trial by jury.

Respectfully submitted,

/s/ Steve Sumner
Steve Sumner
Texas Bar No. 19508500
E-Mail: ssumner@sumnerschick.com
Justin Sumner
Texas Bar No. 24063022
E-Mail: jsumner@sumnerschick.com

Sumner Schick
3811 Turtle Creek Blvd., Suite 600
Dallas, Texas 75219
(214) 965-9229

ATTORNEYS FOR RELATOR

28